DECISION
{¶ 1} Relator, Linda O'Brien, has filed an original action in mandamus requesting this court to issue a writ of mandamus to order respondent, Industrial Commission of Ohio, to vacate its order that denied her application for temporary total disability compensation on the basis that she voluntarily abandoned her employment and to issue a new order addressing the merits of her claim.
{¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Section (M), Loc.R. 12 of the Tenth District Court of Appeals, who rendered a decision including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate decided that a writ of mandamus should be granted to require the commission to vacate its order and to issue a new order that meets the requirements of State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. The commission and respondent-employer, Eaton Center, have filed objections to the magistrate's decision.
{¶ 3} Upon a review of the magistrate's decision and an independent review of the record, this court adopts the magistrate's decision as its own. In its order, the commission found that "claimant violated various work rules which led to her termination on 08/03/2001." As the magistrate noted, the Ohio Supreme Court cautioned in State ex rel. McKnabb v. Indus. Comm. (2001), 92 Ohio St.3d 559, that terminations following an on-the-job injury must be carefully scrutinized. Included in this scrutiny must be a review of the work rules alleged to have been violated in accordance with State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401. Admittedly, the record contains evidence that relator had been cited in the past for failure to meet production standards, improper use of compressed air and poor attitude; however, as the magistrate noted, the record is unclear as to whether a warning as to any one of these violations would be adequate notice to relator that any future violation of other rules could lead to her discharge.
{¶ 4} Therefore, respondents' objections to the magistrate's decision are overruled, and this court issues a writ of mandamus to order respondent, Industrial Commission of Ohio, to vacate its order that denied relator's application for temporary total disability compensation and to issue a new order that addresses the issues set forth in Louisiana-Pacific and McKnabb, and meets the requirements of Noll.
Objections overruled, writ of mandamus granted.
LAZARUS and KLATT, JJ., concur.
 APPENDIX A IN MANDAMUS
{¶ 5} Relator, Linda O'Brien, filed this original action in mandamus asking the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying compensation for temporary total disability ("TTD") on the basis of abandonment of employment and to issue a new order addressing the merits of the TTD request.
Findings of Fact:
{¶ 6} On January 29, 2001, Linda O'Brien was hired as a machine operator by Eaton Corporation. She was given a copy of the company's handbook, which includes the following statement:
 * * * Repeated or chronic disciplinary offenses, regardless of the rule at issue, will result in discipline up to and including immediate discharge. Either the employee or the company may end the employment relationship at any time with or without reason or notice. * * *
The handbook lists ten offenses that will result in immediate discharge. It also lists types of conduct that will result in discipline less than discharge "for an initial offense, though a repeat violation will result in more serious discipline up to and including immediate termination." (Emphasis added.) The less serious violations include:
 Failure to perform to production or quality requirements or perform work as directed by your supervisor or team leader.
* * *
 Leaving the plant or your work area during work time or being away from your job without permission.
{¶ 7} Claimant signed an acknowledgement that she received the handbook, would become familiar with its contents, and was responsible for following the rules.
{¶ 8} The evidence also includes an undated form, signed by claimant, stating her understanding of the safety rule that employees may not use compressed air for personal cleaning and could be terminated for improper use of compressed air.
{¶ 9} On March 1, 2001, a supervisor reviewed claimant's performance as "Satisfactory" in the following areas: attitude, teamwork, follows process, safety, quality, and overall. Claimant's performance was less than satisfactory in regard to quantity. The supervisor commented:
 Linda, You are doing a fine job in Room #2. Your Quality is very good for a new operator. The one thing you can do to improve your Quantity in not oversanding. If you're unsure if something needs sanded ask myself or the trainer.
{¶ 10} As of March 7, 2001, claimant had developed bilateral median nerve neuritis from her work, and a workers' compensation claim was allowed for that condition.
{¶ 11} On April 19, 2001, claimant signed a "Return to Work Program" form describing the roles of the employer and employee in a successful return to work.
{¶ 12} On April 20, 2001, supervisor Tammy Wagner completed the two-month evaluation scheduled for March 30, 2001. Claimant's performance was satisfactory in safety, quality aware, and quality. Areas rated as "Needs Improvement" were attitude, works well with others, works well independently, motivation level, sets goals, and quantity. Ms. Wagner commented: "Linda needs to keep busy by setting goals for herself. Goals will improve your motivation level. Remember we are a team, everyone helps out." Claimant signed the form.
{¶ 13} On April 30, 2001, an extensive performance review was completed by Ms. Wagner. Under the heading "Work Quantity/Quality," she rated claimant as satisfactory in nine categories and as slightly less than satisfactory in six areas, and as unsatisfactory overall. Under the heading "Dependability," Ms. Wagner rated claimant as satisfactory in four areas and slightly less than satisfactory in four areas, and as unsatisfactory overall. Under "Work Habits," six categories were satisfactory and one was not, with an overall rating of "Satisfactory." The supervisor commented:
 Linda needs to find the balance for quantity [and] quality. I will work with you. Focus on the job at hand and continue to set goals for yourself [and] worry less about everyone around you.
 Continue to set 2 hour goals for yourself. Ask fellow co-workers or myself for help if needed. * * *
In the space for employee goals, claimant wrote that her goals were "To be up to rate where it's supposed to be, to try hard to get 1 better than the last." Under "Comments," she wrote:
 On some of the unsatisfactory, I don't agree with. I would like to talk it over with Linda [illegible] and Tammy if possible. If it's allowed.
The form states that the employee's signature indicates review of the appraisal but not necessarily agreement. Claimant signed on May 4, 2001.
{¶ 14} On May 24, 2001, supervisor Linda DePolley completed an incident report that claimant was given a final warning for "Violation of Rules Regulations" and "Safety." The report states in part:
 Explanation of Incident[:] Using compressed air to blow self off (clothing) — gloves while on. Safety Violation pg. 11 in employer handbook.
 Corrective Action Taken[:] A final — 3 day suspension. A discussion of the seriousness and importance of following safety rules. Next Step Termination.
{¶ 15} On or about August 3, 2001, Ms. Wagner described an incident that occurred near the quitting time of 6:30 in the morning:
 At 6:10 AM I stepped into room #3 to rinse my hands off in the sink. I saw Linda O'Brien blowing off her sanders. She blew all 3 of them off, put new paper on, blew her table off, blew the blue [illegible] off. (I had stepped outside of the room was watching). At 6:18 I saw her take her anti-vibration gloves off she looked as if she was putting them in her bag.
 I went up to her told her that it was only 6:18 was not time to quit yet. She said she knew, she was looking for a mint. I told her that I had watched her since 10 after, she said, "I know you have!" I said, "And now you're looking for a mint!" She said, "Yea," I went to the bathroom too because my stomach is upset! Her tone of voice was [illegible] and nasty.
 I told her that when she starts cleaning up early, it sets off a domino effect everyone else thinks it is time to clean up. She told me that she cleans her sanders up good like that all the time.
 I told her that she needed to continue sanding. She said "I will!"
 I walked out to the desk to see if you were here yet because I wanted to address it with you before she went home. The way she talks to me, I feel, is insubordinate, she quit early. This is the 3rd room she has been in people are still asking not to be put with her (I.E. loading etc.)
 I don't feel she is the type of person we want here at AIC.
{¶ 16} On August 3, 2001, Ms. DePolley completed an incident report stating that claimant's employment was terminated for "Unsatisfactory Job Performance" and "Violation of Rules and Regulations," explaining as follows:
 Explanation of Incident: Stopped working early. Failure to perform to production rate.
Corrective Action Taken: Termination is Next Step.
The report notes that claimant had already been given a final written warning on May 24, 2001.
{¶ 17} On August 31, 2001, claimant applied for TTD compensation. The evidence includes several medical reports regarding the extent of disability.
{¶ 18} In October 2001, a district hearing officer awarded TTD compensation.
{¶ 19} In November 2001, a staff hearing officer vacated the award and denied compensation:
 Based upon the evidence provided by the employer, it is found that on 02/02/2001, the claimant received a copy of the "AK Hourly Employee Handbook" which included employee rules. Further, incident reports dated 05/24/2001 and 08/03/2001, establish that the claimant violated various work rules which led to her termination on 08/03/2001.
 In accordance with the Louisiana-Pacific [State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401] and McNabb [State ex rel. McKnabb v. Indus. Comm. (2001), 92 Ohio St.3d 559] cases, it is found that the claimant's violation of specific work rules (which the employer's handbook identified as dischargeable offenses) led to her termination of employment. It is found that the claimant's actions leading to her termination constitutes her voluntary abandonment of employment, thereby rendering her ineligible for payment of temporary total disability compensation.
{¶ 20} Further appeal was refused.
Conclusions of Law:
{¶ 21} The issue in this action is whether the commission abused its discretion in denying TTD compensation on the basis of an abandonment of employment. For the reasons that follow, the magistrate concludes that there was an abuse of discretion and recommends a limited writ of mandamus.
{¶ 22} It is settled that a discharge from employment may be characterized as voluntary in some circumstances. State ex rel. Watts v. Schottenstein Stores Corp. (1993), 68 Ohio St.3d 118. In State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995),72 Ohio St.3d 401, the Ohio Supreme Court stated that, when a worker has been discharged for violating a rule, the commission may conclude that the discharge constituted a voluntary relinquishment of that employment where the company's rule or policy (1) defined the prohibited conduct clearly in writing, (2) identified the violation as a dischargeable offense, and (3) the rule and the consequences of violation were known to the worker or should have been known to him.
{¶ 23} Where a claimant has voluntarily relinquished his job, either by resigning or abandoning it under Louisiana-Pacific, the claimant is deemed to have accepted the consequence of being without wages for a period of time and is not eligible to receive TTD compensation. E.g., State ex rel. McKnabb v. Indus. Comm. (2001), 92 Ohio St.3d 559. In short, under Louisiana-Pacific, when a claimant knows or should know that doing X will likely trigger a discharge, and nonetheless chooses to do X, the resulting loss of wages is caused by claimant's voluntary choice, not the injury.
{¶ 24} However, the court has explained that, where the conduct is causally related to the injury, the termination of employment is not voluntary. State ex rel. Pretty Products, Inc. v. Indus. Comm. (1996),77 Ohio St.3d 5, 7 (explaining that "the circumstances of each case determine whether a departure by firing may be voluntary or involuntary"). Further, depending on the circumstances, a claimant is again eligible for TTD compensation after he has returned to work and then experiences a temporary and total loss of earnings due to his allowed conditions. See State ex rel. Baker v. Indus. Comm. (2000), 89 Ohio St.3d 376.
{¶ 25} The Ohio Supreme Court has cautioned that "a postinjury firing must be carefully scrutinized." McKnabb, supra. Included in this scrutiny is an examination of the nature of the rule. Id.; Louisiana-Pacific. The commission must carefully assess the clarity and specificity of the rule to determine whether it prohibits the precise act/omission that claimant committed, as in Louisiana-Pacific, where an employee failed to report to work for three days without calling in, contrary to a rule prohibiting that specific conduct. In McKnabb, the court emphasized the importance of a specific and clear rule:
 * * * Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
 This case is a good example. The commission speaks of a "strict" employer policy on tardiness and absenteeism. It was apparently not that strict, however, since the claimant, according to the commission, was late "fifteen to twenty" times during an unspecified six-month period. This scenario raises more questions than it answers: how [the employer] defined "late" and whether it was the same for all employees; whether the claimant was routinely only a minute late or substantially later; and when the six-month period of tardiness occurred, e.g., whether the accusations of tardiness were suddenly resurrected to justify termination * * *. [Id. at 563.]
{¶ 26} In the order at issue here, the commission failed to identify the written rules that claimant violated, stating merely that claimant violated "various rules." Given the importance of scrutinizing the written rule when considering whether a firing was a voluntary relinquishment of employment by the worker, the commission's failure to identify the "various rules" prevents judicial review and constitutes an abuse of discretion.
{¶ 27} Second, the commission failed to identify when the violations occurred and failed to identify the specific conduct that constituted the violations. Again, this omission precludes judicial review and constitutes an abuse of discretion.
{¶ 28} In summary, the magistrate concludes that the commission failed to comply with its duty to cite the evidence on which it relied and to provide an adequate explanation of its rationale. Accordingly, a limited writ is warranted returning this matter to the commission. E.g., State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203.
{¶ 29} Several key questions must be addressed by the commission on remand. First, the magistrate agrees that general language in a policy manual can be made adequately specific by means of a written warning or other documents. Thus, in the present action, the employer's vague rules about meeting "production requirements" and performing work "as directed" might support a claim of voluntary discharge if clarified in a written warning, posted notice, or other writing provided to the employee. On remand, the commission must determine precisely what actions (or omissions) were prohibited in written rules and warnings. Under Louisiana-Pacific, the issue is what the worker actually knew or should have known, not the employer's intent.
{¶ 30} In connection with this determination, the magistrate notes that the employer argues in its brief that it discharged claimant based on an aggregation of different offenses that accumulated. The employer argues that its rules and warnings clearly and specifically put claimant on notice, prior to August 3, 2001, that her conduct on that day could trigger a discharge. The employer points to the language in its handbook regarding the consequences of a "repeat violation." The employer contends that the term was not limited to a repeated violation of the same rule but included any subsequent violation of any other rule. In other words, the employer argues that the final warning given to claimant for her air-compressor violation put her on notice that any type of future violation — not just a repeat of the compressor violation — could trigger a discharge.
{¶ 31} For the commission to accept that argument, there must be some evidence of a written policy or warning that informed claimant of how an accumulation or aggregation would be determined. Otherwise, an employer could arbitrarily determine the weight of different offenses, or an employee could misunderstand the specific consequences of certain acts. In the present action, for the commission to accept the employer's argument, it would have to accept that the "final warning" for improper use of the air compressor put claimant on notice that it was also a final warning in regard to any other type of violation.
{¶ 32} Second, after identifying the written rules, warnings, and other writings that put claimant on notice of conduct that could trigger a discharge, the commission must clearly identify the conduct that constituted the violation or violations (if any) of each rule. For example, the memorandum from Ms. Wagner suggests that the alleged offense on August 3, 2001, was that claimant began clean-up procedures too early. If so, the employer must establish that, based on a written rule and/or written warning, claimant knew or should have known that clean-up procedures could not start prior to a certain time and that a transgression could cause her to be fired based on her history of prior discipline. See McKnabb (stating that the nature of the warning is relevant).
{¶ 33} Ms. Wagner's memorandum also suggests that claimant was fired for her attitude, her tone of voice, and for not being the right "type of person." The magistrate concludes that, although such qualitative assessments will certainly justify an employer's decision to terminate a worker's employment on an involuntary basis, a qualitative assessment of "attitude" or "tone" without measurable criteria cannot support a Louisiana-Pacific discharge that is deemed voluntary on the worker's part so as to bar TTD compensation. For Louisiana-Pacific to apply, the claimant must have violated clear-cut requirements of a written work rule.
{¶ 34} In other words, there is no question that the employer had the right to discharge claimant if it did not like her attitude or tone of voice. Here, however, the question is whether claimant voluntarily engaged in conduct knowing that it could get her fired, given that each person is held to accept the known consequences of voluntary violations of written rules.
{¶ 35} For example, if the commission believes that claimant was discharged on August 3, 2001 for failing to perform to "production requirements" or perform "work as directed" by the supervisor, the commission must determine whether there is evidence that the employer had a defined requirement, in writing, that claimant knowingly/voluntarily failed to meet.
{¶ 36} Also, the commission should address the extent to which claimant failed to meet the standard. See McKnabb (in which the court's queried whether the discharged worker was substantially late or only a minute late). Finally, the commission must consider whether claimant's failure to meet production requirements was related or unrelated to her allowed condition. Pretty Products.
{¶ 37} Some of these questions could probably be answered by this court, upon thorough scrutiny of the record in mandamus. However, given the statement in Noll that the court is not required to scour the record to discover whether there is "some evidence" to support the commission's decision, the magistrate concludes that the proper course is for the court to issue a limited writ, returning this matter to the commission to give further consideration to the evidence.
{¶ 38} Therefore, based on the commission's failure to comply with Noll, supra, the magistrate recommends that the court issue a writ of mandamus directing the commission to vacate its order finding voluntary abandonment of employment, to give further consideration to the evidence, and to issue a new order that complies with the above-cited authorities.